## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:20-cv-1855

**THE I4 GROUP CONSULTING, LLC and
Charles Maddox, Jr.,**

      Plaintiffs,

v.

**SCALED AGILE, INC. and
DOES 1 to 10, inclusive**

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

The i4 Group Consulting, LLC ("The i4 Group") and Charles Maddox, Jr. ("Maddox") (together "Plaintiffs"), by and through their undersigned attorney, hereby submit their Complaint and Jury Demand ("Complaint") against Defendants Scaled Agile, Inc. ("SAI") and DOES 1 to 10 (collectively "Defendants"), inclusive, as follows:

### I.     INTRODUCTION

SAI intentionally and unlawfully devised a plan and schemed with the DOES to destroy the business Mr. Maddox spent significant resources and many years building because The i4 Group simply grew too successful as a black-owned company.  The i4 Group built its success using SAI's nation-wide marketing efforts to schedule training courses throughout the country, especially in major U.S. cities, frustrating SAI's much larger non-black owned partners.

SAI, in conjunction with DOES 1 – 10, and with racial animus toward Mr. Maddox and the success of The i4 Group, conspired to systematically put The i4 Group out of business.  SAI

was clearly satisfied with The i4 Group's performance when it entered into the September 28, 2018 Partner Program Agreement ("PPA") with The i4 Group, accepting The i4 Group's $30,000.00 payment on January 15th, 2019 to become a Gold Partner.  Yet mere months after renewing its Gold Partnership and 11 days after depositing The i4 Group's payment, SAI placed The i4 Group on a groundless three-month suspension in furtherance of its scheme to put The i4 Group out of business.

SAI and the DOES had no intention of allowing Mr. Maddox and his black-owned company to survive as an on-going business.  During the suspension, SAI provided vague and unattainable guidelines[1] as to what The i4 Group needed to do to be removed from suspension. SAI then removed The i4 Group from its public training calendar and directory, the primary method for marketing SAFe courses, which prevented The i4 Group from running SAFe courses as required by the PPA (and the primary source of The i4 Group's revenue).  Even so, The i4 Group developed strategies to overcome SAI's manufactured suspension and continued to improve its business model.  SAI then changed its reason for suspending The i4 Group and claimed it had "trust issues" with The i4 Group, failing to identify the trust issues and providing no clear guidance for how The i4 Group could overcome said trust issues.

In furtherance of these efforts to destroy The i4 Group, SAI refused to certify The i4 Group's co-trainer applicants who had satisfied all SAI requirements, and told The i4 Group's subcontractors to distance themselves from The i4 Group if they wanted to stay with and succeed

---

[1] The guidelines on which SAI wanted to measure The i4 Group during the suspension were meaningless because The i4 Group was removed from the Partner Portal and Directory, which prevented it from being able to market SAFe courses, thereby not being able to run any SAFe courses.

in the SAI family.  As a result, all of the i4 Group's subcontractors and trainers stopped contracting with The i4 Group and began contracting with others or starting their own companies.

In April 2019, SAI terminated The i4 Group's PPA, essentially destroying the remainder of The i4 Group's business, which was on track to generate $7,000,000.00 in 2019 with a projected $20,000,000.00 in revenue by 2024.

SAI and the DOES's actions were taken because Mr. Maddox was a black man running a successful black-owned company.  SAI did not treat other non-black Gold Partners in the same manner as it treated The i4 Group.

As a result of Defendants' systematic and intentional actions aimed at harming Plaintiffs, Plaintiffs bring claims of willful and wanton breach of contract, violation of 42 U.S.C. § 1981 (Denial of Rights Due to Race) defamation, tortious interference with contract, violation of the Colorado Antitrust Act, C.R.S. § 6–4–104, and violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1-38 against Defendants.  Plaintiffs also seeks a declaratory judgment finding the arbitration provision within SAI's PPA unenforceable because it contains fee and cost obligations that place an impermissible burden on the Plaintiffs to bear excessive financial expenses that would effectively foreclose The i4 Group's and Mr. Maddox's ability to vindicate their rights.

## Jurisdiction and Venue

1.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1, 42 U.S.C. § 1981 and 42 U.S.C. § 1988 with respect to Plaintiffs' claims for attorneys' fees and costs.  The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1337.

2.      This Court also has jurisdiction over claims alleged herein for relief in the nature of a Declaratory Judgment pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, because Plaintiffs seek a determination of their rights to proceed against the Defendants on their legal and equitable claims within this Court, challenging the enforceability of the below referenced Arbitration Agreement.

3.      Venue is proper in the United States District Court for the District of Colorado, pursuant to 28 U.S.C. § 1391 because the events giving rise to the instant claims occurred within this District and Defendant resides in this District.

4.      The Court has supplemental pendent jurisdiction pursuant to 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and pendent causes of action derive from a common nucleus of operative facts.

## The Parties

5.      The i4 Group, a Texas limited liability company, is a training and consulting firm certified as a Small Minority Business Enterprise with a principal place of business in Dallas, Texas.

6.      Charles Maddox, Jr., an African-American (black) man, is the principal owner of The i4 Group.  Mr. Maddox resides in Texas.

7.      SAI, a Delaware corporation, is a software and systems development consulting services firm with a principal place of business in Boulder, Colorado.  SAI provides Scaled Agile Framework, a framework for implementing agile practices at enterprises.

8.      The true names and capacities, whether individual, corporate, associate or otherwise of the Defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiffs at this time, who therefore sue DOES 1 through 10 by fictitious names and will ask leave

of the Court to amend this Demand to show the true names and capacities of DOES 1 through 10 when the same are ascertained; DOES 1 through 10 are sued as principals and/or agents, servants, attorneys, and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment. Plaintiffs are informed and believe and thereupon allege that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiffs as hereinafter alleged.

## II.     GENERAL ALLEGATIONS

### A.     The i4 Group, owned by Mr. Maddox, was the only black-owned SAI Gold Partner.

9.      The i4 Group was founded in 2012 by principal Charles Maddox, Jr., who has over twenty years of technical leadership in software and electronics development and specializes in Scaling Lean-Agile practices throughout the enterprise, Lean-Agile Transformations, Change Management, Lean Leadership Development and Professional Coaching.

10.     In 2013, SAI launched the Scaled Agile Partner Program, wherein businesses, such as The i4 Group, could partner with SAI to provide Scaled Agile Framework ("SAFe") training.

11.     In 2013, Mr. Maddox became certified as a SAFe Program Consultant ("SPC") by Drew Jemilo, one of SAI's founders. At this time, Mr. Maddox and The i4 Group implemented SAFe training as well as working with other training companies.

12.     In 2016, SAI began to offer SAFe Program Consultant Trainer ("SPCT") certifications to persons outside of SAI who met certain requirements. Mr. Maddox met the requirements and, mentored by Mr. Jemilo, became a SPCT.

13.     Mr. Maddox was the only African-American with SPCT certification associated with SAI out of approximately fifty (50) other individuals and corporations with SPCT credentials worldwide.

14.     As part of the requirements to become a SPCT, The i4 Group was required to become a "Gold" Transformation Partner Level ("Gold Partner").  At that time, Gold Partner level required a $25,000.00 annual fee and five (5) SPCs maintained in good standing throughout the Term of the PPA.

15.     The i4 Group entered into a Partner Program Agreement ("PPA") with SAI on September 12, 2016 ("2016 PPA") for a term of one year, which would automatically renew for consecutive one-year terms.  At this time and pursuant to SAI's PPA, The i4 Group began exclusively providing SAFe training.

16.     The i4 Group was the only black-owned company that was a Gold Partner with SAI.

**B.      SAI opened the U.S. market to schedule courses and The i4 Group targeted key U.S. cities and international markets generating millions of dollars in trainings.**

17.     In 2016, SAI had a closed market for Implementing SAFe courses, wherein Gold Partners had to request approval from SAI to schedule the date and location of SAFe courses.  In 2017, SAI no longer required approval for date and location of classes – Gold Partners were able to offer classes anywhere in the United States with no restrictions.[2]

18.     The i4 Group offered SAFe courses across the United States, including class offerings in the greater New York City area; Chicago, Illinois; Dallas, Texas; Washington, D.C.; Phoenix, Arizona; Atlanta, Georgia; Seattle, Washington; the greater San Francisco Bay area;

---

[2] International locations still required approval.

Minneapolis, Minnesota; and Los Angeles, California. The i4 Group also offered SAFe courses internationally, in Singapore, Mexico City, Mexico and Chennai, India.

19. In 2016-2017, The i4 Group generated approximately $1,500,000.00 in revenue providing SAFe training and consulting pursuant to the 2016 PPA.

20. In 2017-2018, The i4 Group generated approximately $3,900,000.00 in revenue providing SAFe training and consulting pursuant to the 2017 PPA.

21. The i4 Group projected revenue of approximately $7,000,000.00 in 2019 and up to $20,000,000.00 by 2024.

C. **SAI received complaints about The i4 Group's marketing efforts and refund policy and directed The i4 Group to improve by the end of 2018. The i4 Group substantially improved.**

22. Upon information and belief, in 2018 SAI began receiving complaints from high profile, non-black-owned Gold Partners (DOES) about The i4 Group's course offerings in territories in which they desired to have unfettered competitive advantages. DOES used their influence in the industry to pressure SAI to remove The i4 Group from the marketplace.

23. In July or August of 2018, Bryan Kramer, Senior Manager, Enterprise Sales & Partner Development for SAI, communicated concerns with The i4 Group, including class cancellations and timeliness of refunds for classes that were cancelled.

24. On September 13, 2018, Mr. Kramer sent an email to The i4 Group requesting that The i4 Group make changes and show improvements in certain areas for the remainder of 2018. Mr. Kramer stated that if improvements were not shown, SAI reserved the right to suspend The i4 Group from the ability to post and run SAFe training for a minimum of a three-month period.

25. The i4 Group either fully rectified or made substantial improvements, as required, on all changes requested in the September 13, 2018 letter during the remainder of 2018.

**D.** **SAI acknowledged The i4 Group's improvement when it entered into a September 25, 2018 PPA with The i4 Group and accepted its $30,000.00 on January 15, 2019 as payment.**

26.     On September 28, 2018, The i4 Group entered into another PPA with SAI ("2018 PPA") for a one-year term which would automatically renew for consecutive one-year term, including SAI accepting The i4 Group's payment of the increased $30,000.00 Gold Partner level annual fee.

27.     The 2018 PPA stated that SAI could terminate the Agreement for any "material breach that remains uncured for more than 30 days after written notice."

**E.** **Despite The i4 Group's improvements and SAI entering into the PPA with The i4 Group, SAI suspended The i4 Group in January 2019 denying it access to SAI's public training calendar and refusing to approve The i4 Group's trainers.**

28.     Despite meeting the requirements set forth in SAI's September 13, 2018 letter, on January 25, 2019, SAI placed Plaintiff on a suspension for three months.  During the suspension, SAI directed The i4 Group to show that (1) it "had a plan in place to fix the issues;" (2) The i4 Group was no longer receiving complaints from customers regarding refunds; and (3) that 80% of classes posted would run.

29.     During the suspension, SAI denied The i4 Group access to the public training calendar and the Partner Portal and Directory,[3] impeding The i4 Group from generating revenue because it was unable to register any new students into training classes.  The SAI training calendar is an essential resource and when combined with SAI's Partner Portal and Directory receives approximately 150,000 unique visits each month.

---

[3] According to SAI's website, "visitors turn to the scaledagile.com training and event calendar to find the specific training they need…This valuable research centralizes over a thousand classes being offered by Transformation Gold partners worldwide."

30.     SAI policy required that SAFe SPC courses be taught with a SPCT trainer and a SPC approved co-trainer.  In August 2018, The i4 Group submitted an application to SAI for Eric O'Brien to become a SPC approved co-trainer.

31.     SAI informed The i4 Group that Mr. O'Brien met all of the qualifications to become a SPC approved co-trainer except that Mr. O'Brien had to be with The i4 Group for 90 days before approval.  The i4 Group hired Mr. O'Brien as an employee while he awaited approval from SAI.

32.     After Mr. O'Brien completed 90 days with The i4 Group, The i4 Group repeatedly asked SAI for status updates regarding Mr. O'Brien's SPC  co-trainer application.   SAI was unresponsive.  Based on SAI's representations that Mr. O'Brien was qualified as a SPC co-trainer, The i4 Group scheduled Mr. O'Brien to be a co-trainer for trainings.

**F.     During the suspension, SAI refused to certify The i4 Group's SPC co-trainer applications and told trainers to leave The i4 Group if they intended to associate with SAI.**

33.     During The i4 Group's suspension, SAI informed Mr. O'Brien that, despite meeting all stated qualifications, he was not going to be approved as a SPC co-trainer as long as he was affiliated with The i4 Group.

34.     As a result, Mr. O'Brien ended his affiliation with The i4 Group and began seeking work with another SAI Gold Partner to become approved by SAI as a SPC co-trainer.

35.     Also, SPCT candidate Marshall Guillory gave SAI notice of transferring his SPCT Candidacy over to The i4 Group in November 2018.  For two months, SAI did not respond to the notice of transfer, until Guillory updated his latest SPCT requirements in January 2019, at which time he was given notice by SAI that he was no longer an SPCT candidate and would have to re-apply to the program because of his affiliation with The i4 Group. Upon information and belief, after The i4 Group was run out of business and Guillory became established with a different Gold

Partner, SAI allowed Guillory to automatically regain his SPCT candidacy and his ability to co-teach SPC classes.

> G.   **The i4 Group satisfied SAI's suspension requirements, but SAI claimed it had undisclosed "trust" issues with The i4 Group and terminated the PPA on April 25, 2019**.

36.    During The i4 Group's suspension, The i4 Group met all of Defendants' stated requirements despite SAI's attempts to destabilize The i4 Group's business.

37.    Despite The i4 Group's compliance, on April 24, 2019, SAI breached its Agreement with Plaintiff by notifying Plaintiff by telephone that it was terminating the 2018 PPA for an alleged "trust issue" that was neither the subject of the September 2018 letter nor among the stated reasons for the January 2019 suspension.

38.    Although never disclosed by SAI, the "trust issue" may have related to Mr. Maddox teaching two SAFe courses without a co-trainer, which was a SAI policy.  Mr. Maddox's scheduled trainer cancelled,[4] and The i4 Group lacked available co-trainers in part because of SAI's baseless rejections of The i4 Group's co-trainer applications, specifically Mr. O'Brien's and Mr. Guillory's applications.

39.    Thus, Mr. Maddox, faced with either cancelling classes with dozens of students registered to attend in the face of SAI threatening to suspend The i4 Group because of class cancellations, or teach the class without a co-trainer, he fulfilled his obligations to the registrants and taught the classes.[5]

---

[4] Scheduled co-trainers cancelled because of SAI's threats to trainers who associated with The i4 Group that their work with The i4 Group would limit their ability to grow in the SAI community.

[5] SAI's co-trainer requirement is aspirational but only one trainer teaching the course does not impact the students' completion of the coursework because SAI never required the dozens of students taught by Mr. Maddox to retake the course with co-trainers.  Mr. Maddox received "very good" and "excellent" evaluation ratings for the two courses he taught without a co-trainer, showing that students who took the course felt Mr. Maddox sufficiently taught the course.

40.     Other non-black-owned Gold Partners have taught SAFe courses with one trainer and have not been suspended or had their contract terminated.

41.     Further, during The i4 Group's suspension period, SAI asked The i4 Group to send a list of all of its trainers who were contracted with The i4 Group in an attempt to concoct reasons to terminate the 2018 PPA.  This request had never previously been made to The i4 Group or, upon information and belief, to other Gold Partners after they have submitted their trainer lists upon completing their PPA agreement for the year.

42.     On April 25, 2019, SAI terminated The i4 Group's Scaled Agile Partnership and its SPCT license, despite The i4 Group not committing a material breach that remained uncured for more than 30 days after written notice, as required by the 2018 PPA.

**H.     Besides breaching the PPA, SAI further sought to deplete The i4 Group's revenue by removing it from the SAI Partner Portal, the Partner Directory, and preventing it from teaching SAFe courses.**

43.     As a result of Defendant's willful and wanton breach of the 2018 PPA, unlike SAI's treatment of other non-black Gold Partners, Plaintiff was removed from accessing the Partner Portal, the Partner Directory listing, other Gold Partner Benefits, and was forbidden from teaching Implementing SAFe, RTE courses as a trainer or co-trainer, which comprised all of Plaintiff's revenue.

**I.     SAI campaigned to deplete The i4 Group's trainers, telling them that The i4 Group was untrustworthy and to disassociate with it if they wanted to continue progressing within the SAI community.**

44.     SAI contacted The i4 Group's independent contractors and employees and told them that The i4 Group and Mr. Maddox were untrustworthy and The i4 Group's business was failing, and if they desired career longevity in the Scaled Agile Framework, they should

disassociate themselves from Plaintiff.  SAI did not treat non-black Gold Partners in the same manner.

45.     Subsequently, all of The i4 Group's independent contractors disassociated themselves from The i4 Group – joining other SAI Gold Partners or forming their own companies providing SAFe training and consulting – forcing The i4 Group to cease its business operations.

46.     Specifically, a trainer informed The i4 Group that a SAI employee told her that her struggles to be accepted as an SPCT Candidate with The i4 Group consultant should have been a hint that The i4 Group was going out of business.   Further, at the SAI conference in October 2018, a The i4 Group consultant told Mr. Maddox that she heard negative things about him and The i4 Group from SAI, which caused her to think twice about continuing to associate with The i4 Group. Despite her being one of The i4 Group's trainers in 2018, she now will not even return a phone call or text message from The i4 Group.  In addition, two SPCTs associated with The i4 Group at the time of the October 2018 conference informed Mr. Maddox that they did not want to be associated with The i4 Group because they were hearing negative information from SAI about The i4 Group.

**J.      SAI also told one of The i4 Group's largest customers that The i4 Group was suspended and its business was failing, which caused the customer not to renew its contract with The i4 Group.**

47.     On November 12, 2018, The i4 Group entered into a Statement of Work ("SOW") with Emerson Automation Solutions Company ("Emerson") to provide SAFe support and coaching through April 2019, with the intent to extend the contract beyond its original term.

48.     SAI contacted Emerson employee(s) and told them that The i4 Group's Gold Partner status was suspended and its business was failing with the intention for Emerson to terminate its business relationship with The i4 Group.

49.    On February 6, 2019, Emerson informed The i4 Group that it would not be establishing any further contracts with The i4 Group based, in part, on its knowledge of The i4 Group's suspension and SAI's statement that The i4 Group was failing.

### K.    SAI's intentional destruction of The i4 Group's business caused The i4 Group damages.

50.    As a result of Defendants' unlawful conduct, The i4 Group has been forced to lay off and/or terminate 100% of its workforce and nearly ceased its operations in their entirety.

51.    Before the Defendants' unlawful conduct, The i4 Group was projected to generate over $7,000,000.00 in revenue in 2018-2019, with revenue to reach $20,000,000.00 within five (5) years.

### L.    SAI's illegal treatment and breach of The i4 Group's PPA was based on Mr. Maddox being black and successfully running The i4 Group.

52.    SAI has neither suspended non-black-owned Gold Partners after improved performance, nor has SAI suspended non-black-owned Gold Partners with no clear direction or guidance for improvement, like it did to black-owned The i4 Group.

53.    SAI has not suspended non-black Gold Partners and changed the suspension criteria like it did with The i4 Group.   Nor has SAI accused non-black Gold Partners of being untrustworthy, but never clearly explaining the missing trust factor or how the partners could earn back SAI's trust, like it did to The i4 Group.

54.    SAI has not intentionally refused to certify non-black Gold Partner's trainer applications or refused to respond to non-black Gold Partners when asked about the status of trainer application, like it did to the i4 Group, which is black owned.

55.     SAI has not systematically defamed non-black Gold Partners to their trainers and instructed the trainers to disassociate with non-black Gold Partners, like SAI did to The i4 Group trainers.

56.     SAI has not terminated and breached PPAs with non-black Gold Partners who satisfied the Gold Partners Requirements, including paying the $30,000.00 annual fee, like it did to The i4 Group.

57.     SAI has not interfered with business relationships and subcontracts of non-black owned Gold Partners, like it did to The i4 Group.

58.     SAI intentionally denied The i4 Group the right to make and enforce its contracts or to receive the full benefit of its contracts, as described above, because Mr. Maddox is a black man who owned The i4 Group, a successful black-owned Company.

### III.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Willful and Wanton Breach of Contract
### (The i4 Group v. SAI)

59.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

60.     The i4 Group and SAI entered into a valid and enforceable 2018 PPA.

61.     The i4 Group performed all duties under the 2018 PPA, including without limitation, paying the $30,000.00 Gold Partner annual fee and maintaining five (5) SPCs in good standing.

62.     SAI materially breached the 2018 PPA by: (1) placing The i4 Group on suspension with vague and unsupported justifications and without a clear pathway for The i4 Group to be removed from suspension; (2) denying The i4 Group access to the SAI public training calendar during suspension, effectively bringing to an end the business of The i4 Group because it was

unable to register any new students into training classes; (3) failing to provide meaningful support or responses to The i4 Group during the suspension period; (4) subjecting Plaintiffs to a pretextual reason for terminating the parties' contract, ultimately caused by SAI's baseless rejections of The i4 Group's co-trainer applications, without being given an opportunity to cure the alleged breach; and (5) surreptitiously informing independent contractors and employees working with The i4 Group that if they desired career longevity in the Scaled Agile Framework, they should disassociate themselves from The i4 Group.

63.     SAI's purposeful conduct of effectively forcing The i4 Group to cease its business operations by terminating its ability to provide a full spectrum of training classes under SAI and diverting business to other Gold Partners was fatal to the continued business operations of The i4 Group, done heedlessly and recklessly and without regard to the consequences and rights of The i4 Group, its principles, employees, independent contractors, and clients.

64.     SAI's conduct constitutes a willful and wanton breach of the 2018 PPA.

65.     As a direct and proximate result of SAI's willful and wanton breach of the 2018 PPA, The i4 Group has suffered injuries, economic damages, non-economic damages, and losses in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Equal Rights Violation of 42 U.S.C. § 1981
### (Charles Maddox, Jr. v. SAI)

66.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

67.     The United States Code (42 U.S.C. § 1981) states, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts …, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]

15

68.     The i4 Group's principal, Charles Maddox, Jr., is an African-American (black) man who earned his SPCT credentials with SAI and was the only African American (black) with SPCT certification associated with SAI out of approximately fifty (50) other individuals with SPCT credentials worldwide.

69.     On behalf of The i4 Group, Charles Maddox, Jr., entered into the PPA, Gold Partner level, with SAI to teach the full spectrum of SAI's training courses to current and future clients of The i4 Group.  The i4 Group was the only black-owned company that was a Gold Partner with SAI.

70.      SAI interfered with The i4 Group's ability to enforce the PPA and, but for Mr. Maddox's race and his ownership of The i4 Group, SAI would not have prevented him from enjoying the full and equal benefits of the PPA in the same manner as non-black Gold Partners.

71.     No other non-black-owned SAI Gold Partner or individual with SPCT certification was discriminated against based on their race in their PPAs with SAI.

72.     SAI did not arbitrarily deny other non-black-owned Gold Partner's applications for SPC co-trainers and SPCT Candidates.

73.     SAI did not suspend or terminate any other non-black-owned Gold Partner contract without legitimate reasons or without complying with the PPAs.

74.     SAI did not strip any other non-black SPCT certified trainers of their SPCT credentials and prohibit them from teaching the full spectrum of SAI training courses.

75.     No other non-black-owned SAI Gold Partner or individual with SPCT certification was: (1) placed on suspension by SAI without having been given clearly defined and measurable objectives on how to be removed from suspension; (2) denied access to the SAI public training calendar during suspension; (3) terminated from the 2018 PPA after complying with all terms of

suspension; (4) subjected to a pretextual "trust issue," ultimately caused by SAI's baseless rejections of The i4 Group's SPC co-trainer and SPCT Candidate applications, without being given written notice and an opportunity to cure the alleged breach; (5) subjected to SAI surreptitiously informing independent contractors, employees, and clients that if they desired career longevity in the Scaled Agile Framework, they should disassociate themselves from The i4 Group; (6) forced by SAI's actions to lay off and/or terminate 100% of their workforce; or (7) forced to cease the business operation they built.

76.     SAI's intentional discrimination based on race constituted an impairment of Charles Maddox, Jr.'s and The i4 Group's 2018 PPA in violation of 42 U.S.C. § 1981, and was done with malice and reckless indifference to Charles Maddox, Jr.'s federally protected rights because SAI knew or should have known that its actions violated federal law.

77.     Charles Maddox, Jr., has a private right of action under 42 U.S.C. § 1983 against SAI for violation of his federally protected rights secured by 42 U.S.C. § 1981, and for recovery of his attorneys' fees and costs, pursuant to 42 U.S.C. § 1988.

78.     SAI intentionally caused Charles Maddox, Jr., to suffer ongoing injury and severe emotional distress and professional harm that will continue, and SAI's actions caused and continue to cause Charles Maddox, Jr.'s injuries, damages, and losses in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

**Tortious Interference with Emerson Contract and Business Expectancy**
**(The i4 Group v. SAI)**

79.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

80.     The i4 Group and Emerson entered into an agreement on the Statement of Work ("SOW") on November 12, 2018 for The i4 Group to provide SAFe support and coaching through April 2019, with the intent to extend the contract beyond its original term.

81.     SAI knew of the existence of the Emerson Contract because of the significant number of training courses initiated and the training documents provided by The i4 Group consultants to SAI.

82.     SAI intentionally and improperly contacted Emerson regarding The i4 Group, informed Emerson of The i4 Group's suspension and falsely stated that its business was failing with the intention for Emerson to terminate its business relationship with The i4 Group.

83.     As a result of SAI's intentional and improper conduct, Emerson informed SAI that it would not be establishing any further contracts with The i4 Group based, in part, on its knowledge of The i4 Group's suspension and SAI's false representations about The i4 Group's financial status.

84.     SAI's conduct was intentional and improper and constitutes tortious interference with contract and business expectancy.

85.     As a direct and proximate result of SAI's tortious interference with contract and the on-going business relationship, The i4 Group has suffered injuries, damages, and losses in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Tortious Interference with Independent Contractor Agreements
### (The i4 Group v. SAI)

86.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

87.     The i4 Group and each of its independent contractors entered into their respective Independent Contractor Agreements.

88.     SAI knew of the existence of the Independent Contractor Agreements because the independent contractors were The i4 Group's consultants and trainers who had certifications with SAI to teach SAI training courses.

89.     SAI intentionally and improperly contacted The i4 Group's independent contractors, informing them that if they desired career longevity in the Scaled Agile Framework, they should disassociate themselves from The i4 Group.

90.     As a result of SAI's intentional and improper conduct, all of The i4 Group's independent contractors disassociated themselves from The i4 Group – joining other SAI Gold Partners or forming their own companies providing SAFe training and consulting – causing The i4 Group to cease its business operations.

91.     SAI's conduct was intentional, improper, and without justification and constitutes tortious interference with contract.

92.     As a direct and proximate result of SAI's tortious interference with contract, The i4 Group has suffered injuries, damages, and losses in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### Defamation Per Se
### (The i4 Group and Maddox v. SAI)

93.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

94.     SAI falsely stated to The i4 Group's independent contractors and employees, other Gold Partners, and other businesses with whom The i4 Group contracted, including but not limited to Emerson, that they should not associate with The i4 Group because it was failing as a business and that its principal, Charles Maddox, Jr., was untrustworthy.

95.     Prior to SAI's making these defamatory statements, The i4 Group was thriving as a business and exponentially growing its revenue through early 2019.

96.     In response to the September 2018 email, The i4 Group proactively made all required adjustments and was in compliance with the requirements of the 2018 PPA.

97.     Since 2016, The i4 Group and its principal, Charles Maddox, Jr., invested significant time, energy, and money exclusively with SAI to obtain the SPCT certification and Gold Partner status required to teach the full spectrum of SAI classes to The i4 Group's clients – its sole source of income.  As a result of SAI's defamatory statements, all of The i4 Group's independent contractors, employees, and clients disassociated themselves from The i4 Group causing it to cease its business operations under the business model it built.

98.     SAI's defamatory statements have harmed and continue to harm The i4 Group's and its principal, Charles Maddox, Jr.'s, reputation, lowers The i4 Group and its principal, Charles Maddox, Jr., in the eyes of the community and professional world, and deters others from associating with them.

99.     The i4 Group and its principal, Charles Maddox, Jr., have been and continue to be damaged by SAI's false, intentional defamatory statements and suffer injuries, damages, and losses in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

**Violation of the Colorado Antitrust Act, C.R.S. § 6–4–104 and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1-38**
**(The i4 Group v. SAI and DOES)**

100.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

101.     Influential and powerful non-black-owned Gold Partners (DOES) conspired with SAI to remove The i4 Group from the marketplace because The i4 Group was successfully doing business in geographical areas previously monopolized by certain Gold Partners.

102.     SAI and its co-conspirators (DOES) conspired and agreed to drive The i4 Group out of business through a variety of anticompetitive means including, but not limited to, forcing The i4 Group to cease its business operations by terminating its ability to provide a full spectrum

of training classes under SAI and diverting business to other Gold Partners, which represents a contract, combination, or conspiracy in restraint of trade within the meaning of Colorado Revised Statutes § 6-4-104 and 15 U.S.C. § 1-38.

103.     As a direct and proximate result of SAI's and its co-conspirators' agreements in violation of the Colorado Antitrust Act and the Sherman Antitrust Act, The i4 Group has suffered and continues to suffer injuries and damages of the type these acts were designed to prevent. Such injury flows directly from that which makes SAI's and its co-conspirators' conduct unlawful. These damages resulted from The i4 Group having been unreasonably: (1) placed on suspension; (2) denied access to the SAI public training calendar during suspension, effectively bringing to an end the business of The i4 Group because it was unable to register any new students into training classes; (3) subjected, after complying with the terms of the suspension, to a pretextual reason for terminating the parties' contract, ultimately caused by SAI's baseless rejections of The i4 Group's co-trainer applications, without being given an opportunity to cure the alleged breach; (4) subjected to SAI surreptitiously informing Independent Contractors and employees of The i4 Group that if they desired career longevity in the Scaled Agile Framework, they should disassociate themselves from The i4 Group; (5) forced to lay off and/or terminate 100% of its workforce; and (6) forced to cease the business operation The i4 Group built.

104.     As a direct and proximate result of SAI's and its co-conspirators' violations of the Colorado Antitrust Act and the Sherman Antitrust Act, The i4 Group has suffered injuries, damages, and losses in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

**Declaratory Judgment Invaliding The PPA's Arbitration Provision That Plaintiffs Were Required to Enter Into With SAI
(The i4 Group and Maddox v. SAI)**

105.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

106.    Prior to allowing Plaintiffs to become a Gold Partner, a requirement for SPCT, SAI required Plaintiffs to agree to an arbitration provision as part of the PPA.  The PPA and its arbitration provision are attached hereto as Exhibit 1, and incorporated into this Complaint by this reference.

107.    Under the terms of that arbitration provision, SAI required Plaintiffs to agree, inter alia, to settle all disputes by binding arbitration with the American Arbitration Associations and its Commercial Arbitration Rules.

108.    The above referenced arbitration provision is unenforceable because it contains fee and cost obligations that place an impermissible burden on the Plaintiffs to bear excessive financial expenses that would effectively foreclose The i4 Group's and Mr. Maddox's ability to vindicate their rights, including those derived from federal and state statutes, burdens the Plaintiffs would not bear in such an action prosecuted within the federal courts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The i4 Group Consulting, LLC and Charles Maddox, Jr. respectfully request that the Court enter judgment in their favor and against Defendants on Plaintiffs' claims as follows:

A.    Awarding Plaintiffs damages to the full extent proved to compensate for Plaintiffs' losses and continued losses resulting from Defendants' actions towards Plaintiffs and their reputations;

B.      Awarding Plaintiffs punitive and exemplary damages for Defendants' intentional acts in an amount sufficient to deter Defendants from any further wrongdoing in violation of federal and Colorado law, to be determined at trial;

C.      Awarding Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and any general and compensatory damages as proved; and

D.      Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated this 23rd day of June, 2020.

CAMPBELL LITIGATION, P.C.

By: /s/*Stacey A. Campbell*

        Stacey A. Campbell
        Alison Lungstrum Macneill
        M. Johnathan Koonce
        1571 Race Street
        Denver, Colorado 80206
        Tel: (303) 536-1833
        Email: stacey@campbell-litigatnoi.com
        alison@campbell-litigation.com
        johnathan@campbell-litigation.com

        ATTORNEYS FOR PLAINTIFFS